# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 7 Proceedings |
| JOHN E. CORK, | Case No.: 2:11-bk-33110-DPC |
| Debtor. | Adv. No.: 2:12-ap-01675-DPC |
| GUN BO, LLC, | |
| Plaintiff, | **ORDER DENYING DEBTOR'S DISCHARGE** |
| v. | |
| JOHN E. CORK, | |
| Defendant. | |

This matter came before the Court in a bench trial held January 27 and 28, 2015, followed by final briefs and then closing arguments on February 11, 2015. The Court now finds for Gun Bo, LLC and denies John E. Cork's discharge under 11 U.S.C. §§ 727 (a)(2)(A), (a)(2)(B) and (a)(4)(A).[1]

. . .

. . .

. . .

. . .

. . .

---

[1] Unless otherwise indicated, all Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

# Table of Contents

I.  BACKGROUND ......................................................................................................... 4

    A.  Procedural Summary.......................................................................................... 4

    B.  Summary of the Parties' Transactional History and Bankruptcy Litigation ............ 4

    C.  Uncontested Facts ............................................................................................. 6

    D.  Summary of Testimony ...................................................................................... 10

        1.  Debtor ..................................................................................................... 10

        2.  Schwickerath ........................................................................................... 12

        3.  Fortini ..................................................................................................... 13

        4.  Preber ...................................................................................................... 13

        5.  Emilie ...................................................................................................... 14

        6.  Nathan ..................................................................................................... 15

        7.  Kyung ...................................................................................................... 16

        8.  Moran ...................................................................................................... 16

    E.  Analysis of Exhibits and Pleadings Discussed at Trial ......................................... 17

        1.  State Court Litigation ............................................................................... 17

        2.  Schedules and SOFA's.............................................................................. 21

        3.  Section 341 1st Meetings .......................................................................... 22

        4.  Plan and Disclosure Statement ................................................................ 23

        5.  Conversion to Chapter 7 .......................................................................... 23

        6.  The Searchlight Lawsuit........................................................................... 23

        7.  Trustee's Settlement with Gun Bo............................................................ 24

        8.  Trustee's Settlement with Debtor............................................................. 24

        9.  Judicial Notice. ........................................................................................ 25

II.  ANALYSIS .............................................................................................................. 25

    A.  Jurisdiction ....................................................................................................... 25

B. Burden of Proof in § 727 Actions ..................................................................... 25

C. Elements of §§ 727(a)(2)(A) and (B) Claims ...................................................... 25

D. Elements of § 727(a)(4)(A) Claims ................................................................... 27

E. The Court's Additional Findings of Fact and Conclusions of Law .................... 29

    1.    Plaintiff's § 727(a)(4)(A) Claims (False Oath) ....................................... 29

        a.    *Schedules* ............................................................................ 29

        b.    *SOFA's* ................................................................................ 30

        c.    *Chapter 11 1st Meeting Testimony* ...................................... 31

        d.    *Chapter 7 1st Meeting Testimony* ........................................ 33

        e.    *Disclosure Statement* .......................................................... 33

        f.    *Objection to Committee's Motion for OSC* .......................... 34

        g.    *Payment of $17 Million to Debtor's Creditors* .................... 34

    2.    Plaintiff's §§ 727(a)(2)(A) and (B) Claims
(Intent to Hinder, Delay, or Defraud) ..................................................... 36

        a.    *Pre-Petition Transactions and Litigation with Gun Bo* ...... 36

        b.    *Debtor's Insolvency* ............................................................ 37

        c.    *Searchlight and Tiburon* ...................................................... 37

        d.    *Tax Refunds* ........................................................................ 38

        e.    *The Searchlight Lawsuit* ...................................................... 40

        f.    *Monthly Operating Reports* ................................................. 41

        g.    *Schwickerath's Testimony* ................................................... 41

        h.    *Preber's Testimony* ............................................................. 42

        i.    *Debtor's Settlement with Trustee* ........................................ 43

        j.    *Debtor's Settlement Discussions With Plaintiff* ................... 43

        k.    *Payment of $17 Million to Investors* ................................... 44

        l.    *Badges of Fraud* .................................................................. 45

# I. BACKGROUND[2]

## A. Procedural Summary

John Cork ("Debtor" or "Mr. Cork") filed his voluntary Chapter 11 Petition ("Petition") with this Court on December 2, 2011 ("Petition Date") after Gun Bo, LLC ("Plaintiff" or "Gun Bo") hotly pursued its claims against the Debtor and others in the Arizona Superior Court, Maricopa County ("State Court"). Along the way, Plaintiff obtained several sanction awards and, ultimately, a July 2009 judgment against Debtor and others in State Court for $7,047,599.30 plus post-judgment interest. Plaintiff commenced this adversary proceeding ("Adversary Proceeding") by timely filing its September 24, 2012 five-count complaint against Debtor, alleging causes of action under 11 U.S.C. § 727. The parties litigated discovery and pre-trial motions in advance of this Court's trial on the merits. Just as the trial was to begin, Plaintiff made an oral motion to dismiss counts 2, 4 and 5 of its Complaint, which were its claims for relief under 11 U.S.C. §§ 727(a)(3), (5) and (6). Debtor did not object to that oral motion. The Court granted Gun Bo's motion and requested that Plaintiff lodge an order to this effect. Since Gun Bo never lodged an order memorializing this dismissal, the Court now hereby dismisses those claims with prejudice (*see* the January 27, 2015 audio Trial Transcript ("TT") beginning at 9:44 a.m.).

## B. Summary of the Parties' Transactional History and Bankruptcy Litigation

Since the late 1990's, Debtor, through his development and management companies, was involved in numerous land development projects as a land banker.[3] By December 2009, Cork had partnered with over 50 investors in various projects representing more than $50 million of subordinated loans. Plaintiff was one such investor who, in June 2007, loaned $5.6 million to Debtor to develop over 200 lots in Maricopa County on a project

---

[2] This Order sets forth the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. The issues addressed constitute core proceedings over which this Court has jurisdiction. 28 U.S.C. §§ 1334(b) and 157(b).

[3] At trial, Debtor described the mechanics of his land banking operations. *See* TT, January 28, 2015 beginning at 9:41 a.m. Debtor's December 27, 2011 Initial Status Report (Admin. DE 34, Plaintiff's Exhibit 1, Debtor's Exhibit A) claims Debtor was one of the biggest land bankers in the U.S, land banking primarily for publicly traded home builders.

known as Rancho Cabrillo.  Plaintiff's "investor loan" was subordinated to a Chase Bank purchase money loan. This was the only loan/investment between Plaintiff and Debtor. When the real estate market collapsed in the mid-2000's, many of the builders with which Debtor was doing business defaulted on their land banking agreements, leaving Debtor with bank debt that he had personally guaranteed for land loans all over the United States.  He was more than $250 million underwater.  The builder on the Rancho Cabrillo project defaulted and the bank foreclosed on that property. [4]

Facing massive defaults, and the prospects of litigation and tax consequences, in October 2008, Debtor and his lawyers and advisors developed an out-of-court, global restructuring concept to work through his financial problems.  Debtor hit the road pitching this plan to his many investors/lenders across the U.S.  When Plaintiff refused to go along with Debtor's plan, in November 2008, Plaintiff sued Debtor and others in State Court ("State Court Litigation").  Although at least twelve other suits were filed against Debtor prior to the Petition Date,[5] Gun Bo pursued its litigation with particular vigor.  Both sides spent hundreds of thousands of dollars on a legal chess match that this Court finds to be the primary precipitating event which led Debtor to file his Petition. This conclusion is borne out by the main thrust of the comments in Debtor's December 27, 2011, Initial Chapter 11 Status Report (Admin. DE 34). Three weeks after the Petition Date, Debtor filed an adversary proceeding (11-ap-2352) ("Preference Adversary") seeking to recover from Gun Bo, among other things, allegedly preferential transfers said to total at least $1,661,380.50.[6]

The unsecured creditors' committee ("Committee") filed a motion to appoint a chapter 11 trustee or, alternatively, to convert the case to chapter 7 liquidation.  Although Debtor initially objected to this motion, he eventually agreed to conversion of his case to a

---

[4]  The summary in this paragraph, including interchangeable references to investors/lenders and loans/investments, comes directly from Debtor's January 26, 2015 Bench Memorandum.  *See* DE 105, page 2.  All docket entry cites ("DE") refer to the docket number in the Adversary Proceeding, 2-12-ap-01675-DPC, unless noted otherwise.

[5]  *See* Debtor's Statement of Affairs ("SOFA") filed January 6, 2012 at Admin. DE 39.

[6]  On June 7, 2012, this Court's predecessor, Bankruptcy Judge Charles G. Case, granted Gun Bo's motion for summary judgment in the Preference Adversary and entered judgment on June 12, 2012 dismissing the Preference Adversary with prejudice.  Although the chapter 7 trustee, Maureen Gaughan ("Trustee"), soon thereafter filed her motion for reconsideration and motion for leave to amend the Preference Adversary, the Court denied that motion on September 21, 2012.  No appeal followed.

chapter 7. The Court entered the conversion order on June 20, 2012. (Admin. DE 208). Maureen Gaughan was appointed chapter 7 trustee.

While the occurrence of most of Debtor's transactions is not disputed, Debtor's intent behind these pre-Petition and post-Petition activities and transactions lies at the heart of this § 727 contest. The Court denied Plaintiff's February 10, 2014, motion for summary judgment (DE 50) on June 6, 2014 (DE 76), largely because this Court found material genuine issues of fact existed concerning Debtor's intent. In essence, Debtor contends he did not have the requisite § 727 intent because his actions and transactions were in furtherance of a master plan designed to maximize the return to all his creditors. Plaintiff contends Debtor's actions and transactions were taken with the intent to hinder, delay and defraud Plaintiff and that Debtor made false oaths or accounts during the course of his bankruptcy proceedings.

The parties are playing for high stakes. Debtor's Schedules reflect unsecured debts owed by him in the amount of $197,119,675.50 and total debts of $210,565,417.11 (Admin. DE 38, page 1).

**C.    Uncontested Facts**

The parties' filed their Joint Pretrial Statement ("JPS") (DE 101) on January 21, 2015, which contains the following uncontested facts which the Court now adopts as a part of its findings of fact:

1.     Gun Bo obtained a judgment ("Judgment") against Mr. Cork, his wife Susan Cork ("Mrs. Cork"), CW Capital Fund One LLC, and Mr. and Mrs. Cork as Trustees of the John & Susan Cork Revocable Trust in July 2009 in State Court, in the amount of $7,047,599.30 plus post-judgment interest at the rate of 20%.

2.     The State Court entered the following post-judgment orders:

|   |   |   |
|---|---|---|
| a. | May 3, 2010 | (Trial Ex. 15) |
| b. | August 2, 2010 | (Trial Ex. H) |
| c. | August 10, 2010 | (Trial Ex. 16) |
| d. | November 1, 2010 | (Trial Ex. 18) |
| e. | November 18, 2010 | (Trial Ex. 19) |
| f. | December 30, 2010 | (Trial Ex. 17) |
| g. | May 9, 2011 | (Trial Ex. 22). |

3. Mr. Cork filed for bankruptcy on December 2, 2011.

4. In this Adversary Proceeding and the related administrative proceedings, the Court entered the following orders, and Mr. Cork made the following filings:

   a. Debtor's Initial Chapter 11 Status Report (Admin. DE 34).
   b. Preference Adversary #2:11-ap-02353-CGC.
   c. Order granting Gun Bo's motion for summary judgment (DE 48 in Adv. Pro. #2:11-ap-02352).
   d. Mr. Cork's Motion for Rule 2004 Examination (DE 46).
   e. Order regarding Mr. Cork's Rule 2004 Motion (DE 92).

5. On January 6, 2012, Mr. Cork filed his Schedules and SOFA's. *See* Admin. DE 38 and 39.

6. On February 9 and March 2, 2012, Mr. Cork amended his Schedules and SOFA's. *See* Admin. DEs 61, 63 and 106.

7. Searchlight Fund, LLC ("Searchlight") was formed in November 2010 as a Nevada limited liability company.

8. Cork has no ownership interest in Searchlight. Searchlight is owned by Mr. and Mrs. Cork's children, Emilie ("Emilie") and Nathan Cork ("Nathan").

9. Emilie and Nathan formed Tiburon Management Company, Inc. ("Tiburon") was formed in September 2010 as an Arizona limited liability company. Emilie and Nathan are also its directors. Emilie and Nathan are also the owners through E&N Holdings, LLC ("E&N"), which holds the equity in Tiburon.

10. Cork has no ownership interest in Tiburon.

11. Searchlight had an account at Charles Schwab ("Schwab Account"). Emilie and Nathan were the authorized signatories on the Schwab Account.

12. Searchlight had an account at IBC Bank ("IBC Account"). Debtor had more than a decade-long banking relationship with IBC. Emilie and Nathan were the authorized signatories on the IBC Account.

13. As of December 1, 2010, the Schwab Account balance was $0.00. Between December 3 and December 9, 2010, and within a year of the Petition Date, Debtor

deposited $2,261,551.00 in personal tax income refunds ("Tax Refunds") into the Schwab Account ("Searchlight Funds").

14. Cork listed in his bankruptcy schedules $500,000 of the Searchlight Funds as a liquidated debt owed to Debtor by Searchlight. *See* Schedule B, paragraph 18 at Admin. DE 38.

15. On March 12, 2012, the Committee filed a Motion for an Order to Show Cause, demanding that Debtor appear and explain why he had not yet returned the Searchlight Funds to the estate. *See* Motion for Order to Show Cause (Admin. DE 135).

16. In his March 19, 2012 response, Debtor stated that "there is no urgency mandating the immediate deposit of the Searchlight funds into an estate account. The Debtor's Chapter 11 plan will account for the full amount of the Searchlight funds." *See* Objection to Motion for Order to Show Cause (Admin. DE 144 at ¶ 14). Mr. Cork also stated that with respect to Searchlight, he "does not necessarily have complete control over the entity." *Id*. at ¶ 8.

17. On April 2, 2012, Debtor filed a Plan of Reorganization ("Plan") (Admin. DE 156) and accompanying Disclosure Statement (Admin. DE 155).

18. Cork asserted that he would fund his Plan through the "liquidation of the debt in the amount of $500,000 owed by Searchlight, LLC to the Debtor." Plan at 14-15 (Admin. DE 156).

19. On April 2, 2012, Cork filed a two-page breach of contract complaint in the State Court against Searchlight ("Searchlight Lawsuit"). That complaint asserted that "[a]fter Searchlight was formed, Plaintiff loaned $500,000 to Searchlight," and that Mr. Cork and Searchlight had "entered into a valid contract whereby Plaintiff advanced a loan to Defendant in the amount of $500,000." (*See* Trial Ex. 27).

20. Tiburon's articles list Emilie and Nathan as incorporators, as well as the directors of Tiburon. Emilie and Nathan are also the owners of E&N. E&N holds the equity in Tiburon.

1      21.    When asked "what do you do for Tiburon," Emilie responded that "I basically

2 sign things that need to be signed."

3      22.    Cork has no ownership interest in Tiburon or Searchlight, and he is not

4 employed by Tiburon or Searchlight.

5      23.    Debtor appeared as the Rule 30(b)(6) "person most knowledgeable" in the

6 depositions taken of Searchlight and Tiburon.

7      24.    None of the Searchlight Funds were transferred back to the debtor-in-

8 possession account.

9      25.    Cork testified as follows regarding his efforts to obtain the Searchlight Funds:

```
19   Q.  Well, whenever you wanted money to go from
20   Searchlight to pay your lawyers or to go to Tiburon or go
21    wherever, you would ask and that would happen.  Is that
22   right?
23   A.  That's right.
24   Q.  And then once you filed bankruptcy, though, when
25   you asked the $500,000 to go to the debtor-in-possession
 1    account, my understanding is that Searchlight refused.
 2   A.  Evidently so. It never showed up, so . . .
 3   Q.  How did you ask Searchlight for that $500,000?
 4   You sent an email?  Did you call your daughter?  What did
 5   you do?
 6   MR. RICH:  Object to the form.
 7   THE WITNESS:  I don't recall. Asking my
 8   kids to put the money into that account and it didn't
 9    happen.  I have no other response to that.
10   BY MR. McKIRGAN:
11   Q.  How many times did you ask?
12   A.  Don't know.
13   Q.  Did they, either Emilie or Nathan, say no or they
14   just never responded?
15   A.  Just never responded.
16   Q.  When you saw her, did you ask her, "Hey, what
17   about the $500,000?"
18   A.  I asked, yeah.
19   Q.  And how did she respond?
20   A.  No, I guess. It never happened, basically. So I
21   mean . . .
```

28 *See* Transcript of Cork dated December 18, 2013, pp. 23 and 24).

26. Cork continued to direct money out of the IBC Account after he filed for bankruptcy, including directing the transfer of funds to Tiburon. Mr. Cork testified:

> 12   Q. Well, after the bankruptcy was filed, did you ask
> 13   your children to send money to Tiburon?
> 14   A. Probably, yes, if that's where it went, yeah.
> 15   Q. And would they agree and send the money to
> 16   Tiburon when you asked?
> 17   A. Yes. I assume you've seen checks.

Id. at pp. 25.

27. Cork provided the Trustee with financial records, including, but not limited to, bank statements, tax returns, QuickBooks records and the report of Mr. Cork's expert witness in this case, Bradley Preber ("Preber").

28. On August 19, 2014, Cork entered into a settlement with the Trustee (Admin. DE 385).

29. The Court approved the settlement between Cork and the Trustee on October 22, 2014. Admin. DE 407.

**D.    <u>Summary of Testimony</u>**

At trial, the Court heard live testimony from Debtor, his expert witness, Preber, his business colleague and fellow land banker, John Fortini ("Fortini") and Gun Bo's expert, David Schwickerath ("Schwickerath"). Additionally, the parties stipulated to the admission of all or parts of transcripts of depositions of Debtor's children, Emilie and Nathan, as well as Gun Bo's employees or agents, James Kyung ("Kyung") and Su Moran ("Moran"). While the parties stipulated to the admission of many documents, this Court advised them that it would review and consider only the exhibits discussed at trial (TT January 27, 2015 at 9:51 a.m.).

The Court now briefly describes these witnesses' testimony.

**1.    <u>Debtor</u>**

Plaintiff called Debtor in its case in chief and then Debtor testified in his own defense. Debtor has been and continues to be involved in the real estate business, particularly land banking. Debtor holds an Arizona real estate broker's license and has been

involved in over 100 land-banking transactions over the past 15 years. He described for the Court the typical structure of a land-banking transaction, including the financial arrangements and risks, as well as legal structures created, construction contracts, option agreements, loan agreements, and typical timelines. He noted these projects included expenses to acquire and develop the subject land. The acquisition and development funds typically came in the form of a homebuilder's deposit, a first-lien loan from a financial institution, and a second-lien loan/investment from a private lender. The Debtor usually guaranteed the first-lien loans. He noted that he had about 30 investors who typically invested $50-$75 million but that he did not always guarantee those investments. He described his transactions and contact with Plaintiff related to the Rancho Cabrillo project, how the financial crisis of 2008 impacted his land-banking projects, and how it exposed him to massive personal liability. He described his efforts to settle with Gun Bo both before it commenced the State Court Litigation and after. He stated Gun Bo's claim was a relatively small issue in view of the hundreds of millions of dollars he owed. Debtor testified that Gun Bo was never his primary concern. He claimed no other investors sued him but, rather, such investors continue to work with him (TT, January 27, 2015, after 11:20 a.m.).

The Debtor described the entities he operated and named some of the people who worked for him, including his CFO, Julie Jagielko. Debtor discussed his former operating entity, Coronado West, and the formation and operations of the Los Cabos Trust. In the wake of the financial crisis, Debtor claimed to have borrowed $600,000-$700,000 against his home and to have put those funds into his businesses. He also claimed to have put all but about $1 million of the Los Cabos Trust's funds into these businesses.[7]

Debtor described transferring the Tax Refunds in December 2010 to the newly created Searchlight entity, allegedly to support his business operations. He claims Tiburon[8] was formed, not to keep money away from Plaintiff, but rather to enable him to

---

[7] Debtor noted that this $1 million went to Plaintiff and that, shortly after the Petition Date, he filed the Preference Adversary seeking to claw these funds back from Gun Bo.

[8] The English translation of the Spanish word "tiburon" is "shark."

continue operating his businesses, since he could no longer operate through the Coronado West entity as result of the Judgment. (Id. at 11:20).

Debtor claimed to have produced to Gun Bo and the Trustee approximately 150 boxes of documents, including accounting records of Debtor and his various businesses. He claimed he has been deposed or otherwise testified on approximately a dozen occasions in connection with his legal tussles with Plaintiff. He contended his cooperation evidences his good faith and good intentions towards all his creditors, including Plaintiff.

Debtor suggested his post-Petition lawsuit against Searchlight stands as evidence that he properly discharged his fiduciary duties to his creditors and that the Searchlight Lawsuit demonstrated he was acting in good faith during the course of his chapter 11.

Debtor suggested his repeated efforts to settle with Plaintiff reflects his good faith and counter any suggestion that he intended to hinder, delay or defraud Plaintiff.

Debtor pointed to his settlement with the Trustee as providing over $1 million to creditors of this estate, evidencing not only his good intentions but also mitigating the effects of the post-Petition dissipation of the $500,000 which he claimed Searchlight owed to him on the Petition Date.

### 2. Schwickerath

Plaintiff called Schwickerath as a forensic accounting expert witness. He had no prior land-bank experience or land-bank-fraud experience but has testified in over 80 depositions and more than 30 arbitrations. His report was largely based on a 16-page Excel spreadsheet Debtor's people provided to him (*see* Plaintiff's Exhibit 40). His Declaration and November 15, 2013 report (Plaintiff's Exhibits 23 and 24) and his January 6, 2015 supplemental report (Plaintiff's Exhibit 26, including Attachments A–H, which are Plaintiff's Exhibits 54–61) and rebuttal report (Plaintiff's Exhibit 25) were admitted into evidence. His live testimony started with his cross-examination. Schwickerath looked at all dollars in and out of Searchlight but not necessarily all funds in and out of Tiburon. The

only funds placed into Searchlight's Schwab account were Debtor's Tax Refunds, consisting of four 2011 checks totaling $2,261,551, plus any earnings generated by that account. The money drawn out of Searchlight included $26,500 paid to the Trustee, $1,042,000 paid to Tiburon, $451,500 to Smart Real Estate AZ, $425,896 to pay legal fees, $446,142 to other properties controlled by the Debtor and $182,346 to creditors.

### 3. Fortini

Debtor called Fortini. His Curriculum Vitae is Debtor's Exhibit I. He testified that he has known the Debtor 13 to 14 years, worked on several real estate projects with him and still has business dealings with him. Fortini explained how land bankers work with privately held and publicly traded home builders and builders of the horizontal infrastructure sought by home builders. He highlighted the importance of land bankers' relationships with developers and horizontal builders. He described option contracts, financing structures, and profit margins typical of land banking. Fortini testified that land values decreased by about 70% beginning with the real estate collapse in 2008 and over the years following.

### 4. Preber

Debtor also called Preber. Preber is a certified fraud examiner with Grant Thornton LLP. He has been involved in over 30 fraud investigations. His Curriculum Vitae is Debtor's Exhibit G. He reviewed the ultimate use of the Tax Refunds and determined that 71% of the $4.619 million[9] he reviewed was used in connection with business expenses, with the balance used for Debtor's personal purposes. Preber, however, could not identify whether the expenses paid with these funds were in aid of Debtor's creditors or Tiburon's, or whether they were on account of creditors' pre- or post-Petition claims. Preber's report dated December 17, 2013 (Debtor's Exhibit E) and corrected/amended report dated November 14, 2014 (Debtor's Exhibit F) were admitted into evidence. Preber found Debtor's in-house financial person, Julie Jagielko, to be competent and reliable, and found Debtor's accounting processes to be customary and not

---

[9] Consisting of the Tax Refunds and earnings on those refunds.

unusual for closely held entities doing real estate deals. Preber found complete transparency in the transactions he reviewed and found no predicate indicating fraud. Preber found Cork paid $1,029,000 to creditors (plus an additional $1.3 million paid to the Trustee via Debtor's settlement with the Trustee), in contrast to the $182,000 Schwickerath found. Preber was very unimpressed with Schwickerath's report and methodology.

Before trial, Gun Bo filed a motion in limine to exclude Fortini's testimony on the grounds that (1) Debtor failed to properly disclose Fortini, and (2) that Fortini's testimony regarding land banking was irrelevant to Debtor's intent. Debtor filed a motion in limine to exclude Schwickerath's reports and testimony on the grounds that (1) the Court was competent to hear the evidence without an expert, and (2) the reports and testimony did not go to a fact in issue at trial. The Court denied Debtor's motion in limine, ruling that it would admit both of Schwickerath's reports into evidence, and that Schwickerath's live testimony would begin with his cross-examination. The Court also denied Gun Bo's motion to exclude Fortini's testimony, but limited such testimony to general facts about land banking transactions. The Court barred Fortini from testifying about any land-banking deals in which he might have been involved with Debtor.

5.  Emilie

Emilie Cork testified by deposition given on December 26, 2013. She is a special-education teacher residing in Gilbert, Arizona. Although she was the president of Searchlight, she did not know who owned it or managed it and had no knowledge of its principal assets, namely funds held in the Schwab Account and IBC Account. Although she was an owner of E&N (which this Court finds to be a reference to Emilie and Nathan), she had never heard of that entity. Although she was an organizer and director of Tiburon, and Tiburon's owner via E&N, she was not involved in its management nor did she know who was. Approximately once a month she went to her father's office at Tiburon to sign papers and/or checks which Julie Jagielko, Monica Suero or the Debtor asked her to sign. They did not explain what it was she was signing and she did not ask. She was paid on a regular basis by both Tiburon and Searchlight.

6.     <u>Nathan</u>

Nathan Cork testified by deposition on November 27, 2013. Nathan's deposition reveals he knew very little about and had very little involvement in the management of either Tiburon or Searchlight. As to Searchlight, for example, he did not know whether he was or was not a member of the LLC. He did not know whether there were any other members besides himself and his sister. He did not know whether Searchlight had any employees. He did not know whether he had ever done any work for Searchlight or whether he had ever made any decisions on behalf of Searchlight. He was unsure of why or when Searchlight was formed. He did not know whether Searchlight had a phone number or an office address. He was unsure of whether he had ever received any financial reports or account statements from Searchlight. He did not know whether he had ever authorized any disbursements from Searchlight's account. He did not know whether or where Searchlight kept any business records. He would receive checks attached to sticky notes directing him to sign the checks, and he would sign them. He signed the checks at Julie Jagielko's and Debtor's direction.

Nathan testified that he was involved in doing "fix and flips" with Tiburon. He knew that Tiburon received money from Searchlight, via checks that he made out to Tiburon at Julie Jagielko's and Debtor's direction, to purchase properties that he would then fix up. He did not know what benefit Searchlight received for the money it gave to Tiburon. He testified that his father was part of the Searchlight "team," but he did not know whether his father was an owner of Searchlight. Nathan never looked at Tiburon's financial statements, did not know anything about Tiburon's month-to-month performance, and he made no attempts to learn about Tiburon's financial performance or condition. He never spoke with Emilie, Tiburon's other member and manager, about Tiburon's operations. He did not pay attention to Tiburon's account balances. He was unsure of whether he had ever refused to sign a Tiburon account check that his father had asked him to sign.

In short, Nathan's deposition testimony confirms that he had very little to no involvement in managing Searchlight and Tiburon. He had virtually no knowledge of their

finances, operations, employees, management structure, or governing documents. He did not know the purpose or nature of the vast majority of the transactions between the two entities. He testified that he did not know of or perform any management duties beyond signing the checks which Julie Jagielko or Debtor left for him to sign.

### 7. Kyung

Kyung testified by deposition on September 10, 2014. The deposition transcript is hereinafter referred to as "Kyung Transcript." He has worked for Plaintiff since 2009 and serves as an in-house lawyer and project manager for Gun Bo. After conducting his due diligence, Kyung recommended that Gun Bo invest in Debtor's Rancho Cabrillo property. Plaintiff took a junior lien position on its loan for $5.6 million with interest at 20%. When the bankrupt home builder TOUSA walked away from its option agreement with Debtor (or the Rancho Cabrillo entity), the first lienholder foreclosed Plaintiff's lien, leaving Gun Bo an unsecured creditor of Debtor. Kyung testified that he was involved in analyzing settlement offers from Debtor and in structuring Gun Bo's settlement offers to Debtor. Kyung claims Debtor hid his assets from Plaintiff's collection efforts and that he did not trust Debtor. He notes he has never talked to Debtor's creditors. He testified that Gun Bo received the following in its settlement with the Los Cabos Trust: (1) $1.23 or $1.27 million from the Los Cabos Trust (*see* p. 48, Kyung Transcript), (2) a San Diego condo which was sold for over $1 million (*see* pp. 48 and 57, Kyung Transcript), (3) some ownership interest in the property of West Parkland, LLC (*see* p. 48, Kyung Transcript) and (4) $100,000 related to the Tuscano property (*see* p. 48, Kyung Transcript). Kyung noted that Plaintiff obtained a State Court order allowing it to take control of Coronado West but that it never did so.

### 8. Moran

Moran testified by deposition on September 10, 2014. She is the president of Parkland Development, LLC and has worked for Gun Bo's principal, Mr. Park, since December 2008. Parkland manages Gun Bo. She first became involved in matters related to the Debtor in December 2008 when Plaintiff sued Debtor and others. She never met with

Chase Bank concerning its senior lien position against the Rancho Cabrillo property. She was present for both mediations between the parties.

**E.** <u>**Analysis of Exhibits and Pleadings Discussed at Trial**</u>

1. <u>State Court Litigation</u>

The State Court Litigation commenced in 2008, lasting over 3 years and culminating in entry of the July 15, 2009 Judgment (Plaintiff's Exhibit 13) and numerous post-Judgment orders in favor of Plaintiff. The Post-Judgment State Court orders and minute entries held, in relevant part, as follows:

a. <u>December 23, 2009 – Judge Karen Potts (Plaintiff's Exhibit 14)</u>

On or about March 16, 2007, Debtor and Mrs. Cork ("Corks") established the Los Cabos Trust. The Corks are the settlors and, together with their children, the sole beneficiaries of the Los Cabos Trust. Judge Potts found that Debtor controlled the Los Cabos Trust.

Debtor directed the transfer of the following funds to the Los Cabos Trust:

a. May 14, 2009 $800,000;
b. June 26, 2009 $1,000,000;
c. July 7, 2009 $1,000,000; and
d. <u>July 6, 2009 $300,000</u>.
   Total: $3.1 million

These funds were, as Debtor acknowledged to the State Court under oath, the personal property of Corks, even though Debtor transferred some of the funds by and/or through Coronado West, Inc.

Of the $3.1 million referenced above, the "Corks withdrew just over $135,000 from their personal bank accounts in July 2009." The State Court did not know how the Corks used the funds.

Debtor made these transfers after Gun Bo had started the State Court Litigation. To the State Court, it appeared that Debtor made the transfers in order to secret funds from Plaintiff.

1  The State Court found that these transfers hindered and delayed

2  Plaintiff's ability to collect its Judgment, within the meaning of A.R.S. § 44-1004(A)(1).

3              b.     <u>May 3, 2010 – Judge Karen Potts (Plaintiff's Exhibit 15)</u>

4  The Corks have complete control over the Los Cabos Trust and that the

5  trustee of the Los Cabos Trust never refused any request Debtor had made for money from

6  the Los Cabos Trust.  Judge Potts found the spendthrift provision of the Los Cabos Trust to

7  be unenforceable as a violation of public policy.  Plaintiff was entitled to reach the Los

8  Cabos Trust res because the res was available for distribution to the Corks as beneficiaries

9  of the Los Cabos Trust.

10  Debtor transferred the following sums to the Los Cabos Trust: $3

11  million on 7/7/07, $2.5 million on 6/6/08, $800,000 on 5/14/09, $4 million on 6/29/09,

12  $300,000 on 7/6/09, and $1 million on 7/7/09.  Of the $8,600,000 Mr. Cork transferred to

13  the Trust, he fraudulently transferred at least $3,100,000 under A.R.S. § 44-1004(A)(2)

14  because (a) the Corks received nothing of value in exchange for the transfers, and (b) the

15  Corks should have believed that they would incur debts beyond their ability to pay as they

16  became due.

17  The State Court ordered the Corks and the Los Cabos Trust to liquidate

18  $3,100,000.00 of the Los Cabos Trust res and deposit that amount in an account in the name

19  of Gun Bo.

20              c.     <u>August 2, 2010 – Judge Karen Potts (Debtor's Exhibit H)</u>

21  This minute entry concerned disputes over a proposed order which the

22  parties were to submit following the May 3, 2010 minute entry and need not be recounted

23  beyond noting this issue.

24              d.     <u>August 10, 2010 – Judge Karen Potts (Plaintiff's Exhibit 16)</u>

25  The State Court ordered the Corks to, among other things, "cause all

26  assets of the Los Cabos Trust, wherever situated, to be repatriated, transferred, assigned, or

27  otherwise turned over to Plaintiff within thirty (30) days . . . and take any and all necessary

28

1  steps, and execute and deliver any and all necessary writings, to comply with" the State

2  Court's Order.

3              e.    November 1, 2010 – Judge Karen Potts (Plaintiff's Exhibit 18)

4              This minute entry concerned an evidentiary hearing on Gun Bo's

5  application for an injunction involving transfers of the Westpark property.  The State Court

6  held:  "Plaintiff has established a strong likelihood of success on the merits in regard to

7  Plaintiff's fraudulent transfer allegation.   There is strong evidence that the sale of the

8  Westpark Property was a fraudulent conveyance in that there was no consideration paid for

9  the Property by Westpark One, LLC, which purchased it from CW Capital Fund One,

10  LLC."

11             The State Court also made the following findings concerning the

12  Debtor's control of certain entities:   The Debtor engages "in real estate development

13  activities through the use of separate LLCs and at least one Trust.  While property of a

14  corporation may not be treated as the property of its member(s) without evidence that the

15  corporation is the alter ego of the member(s), Plaintiff has established a likelihood of

16  success on this issue with regard to the Westpark Property.  The Westpark Property is

17  currently owned by Westpark One, LLC . . . Defendant John Corks' control over Westpark

18  One, LLC is supported by the following facts:  [Debtor] incorporated Westpark One, LLC .

19  . . ; Westpark One, LLC is 100% owned by JCSC, LLP which in turn is owned by the Los

20  Cabos Trust, [Debtor] and his children . . . ; the Court has already found that the Los Cabos

21  Trust assets are available to Plaintiff due to [the Corks'] control over said Trust . . . ; and

22  [Debtor] controls JCSC, LLC . . . .   Defendant John Cork wholly owns CWI Investors

23  Holdings 3, LLC . . . which holds the Deed of Trust that purportedly reflects the interest

24  held by the third-parties . . . ."

25             The State Court granted "a preliminary injunction enjoining [Debtor],

26  Westpark One, LLC, JCSC, LLP, CWI Investor Holdings Three, LLC, and any entities

27  owned and/or controlled, directly or indirectly, by [Debtor], and any person or entity in

28  active concert or participation with [Debtor] from transferring directly or through

foreclosure, deed of trust or otherwise, or encumbering by lien the Westpark Property or any interest in that Property . . . ."

    f.    <u>November 18, 2010 – Commissioner Kirby Kongable</u> <u>(Plaintiff's Exhibit 19)</u>

In connection with garnishment proceedings brought by Plaintiff in State Court, Commissioner Kirby Kongable found:  Mr. Cork had taken certain actions (described in this minute entry) "in an effort to avoid the Court's writs through the use of the various entities that he owns, manages and/or otherwise controls."

    g.    <u>December 30, 2010 – Judge Karen Potts (Plaintiff's Exhibit 17)</u>

In connection with contempt proceedings brought by Gun Bo, Judge Potts noted the following:

"The Court finds:

. . .

4.    [Debtor] has engaged in a practice of moving assets by and between corporations which he controls, using a web of different corporations to confound Plaintiff in its effort to collect the underlying judgment in this case."

The State Court then found and ordered ". . . that there is clear and convincing evidence to hold [the Corks] in civil contempt of Court."

    h.    <u>May 9, 2011 – Judge Karen Potts (Plaintiff's Exhibit 22)</u>

In connection with further contempt proceedings brought by Gun Bo against the Corks, the State Court made the following findings:

"5.    [Debtor] has previously testified in that as of November 2009, Defendants' personal expenses had been paid on their behalf by Coronado West, LLC for nearly 20 years. (*Hearing Exhibit 40, 227:1–229:10*).  Coronado West, LLC also paid [the Corks] a salary of nearly $25,000 per month for some undetermined time. (*Id.*)  [Debtor] testified that when Plaintiff served a writ of garnishment on Coronado West, LLC in November 2009, he instructed the corporation to stop paying [the Corks] a salary because he didn't want Plaintiff to collect on its Judgment. (*Id.*)  Moreover, while Mr. Cork had

previously testified that the reason Coronado West, LLC paid his personal expenses was because that corporation owed him money, when Plaintiff attempted to garnish that debt, Mr. Cork answered said garnishment on behalf of Coronado West, LLC, under oath, by stating that no such debt was owed. (*Id. at 229:7–233:8.*) [The Corks] attempted to justify the elimination of this debt through a series of adjusting entries within the books and records of Coronado West, LLC. The foregoing facts are important to the Application now before the Court because they evidence [the Corks'] affirmative efforts to thwart the garnishment process at issue here; those facts are also relevant to Mr. Cork's credibility.

Payments made by Westpark One, LLC towards certain real and personal properties were deemed to be payments for the 'personal expenses' of the Corks.

"THE COURT HEREBY FINDS John and Susan Cork in contempt of court for (1) failing to obey the writ of garnishment issued to Westpark One, LLC in May 2010, and (2) willfully disobeying this Court's November 18, 2010 Order by failing to withhold all amounts subject to garnishment pursuant to said Order."

To summarize the State Court Litigation, prior to Debtor's bankruptcy he was found to have dominated various entities so as to confound Gun Bo's collection efforts, that he fraudulently transferred property so as to avoid Gun Bo's collection remedies and that he repeatedly disobeyed the State Court's orders.

2.      Schedules and SOFA's

The Debtor's Schedules (Plaintiff's Exhibit 30) and SOFA's (Plaintiff's Exhibit 31) and amendments to these filings (Plaintiff's Exhibits 31–34 and Debtor's Exhibit D) reflect, among other things, that the Debtor was severely insolvent on the Petition Date. His assets totaled less than $6.2 million while his liabilities exceeded $210 million. More than $1.6 million of these assets are identified as a § 547 preference claim against Plaintiff. That action proved to be worthless when the Court dismissed Debtor's Preference Adversary. Debtor identified an additional $500,000 asset as a "loan"

Searchlight owed to him. Post-Petition, Debtor dissipated all but $26,500 of the $500,000. Debtor initially identified $1.9 million of the assets listed as an exempt IRA. His March 2, 2012 amended Schedule B identified the value as $1,467,596 and then added Mrs. Cork's exempt IRA as totaling $1,226,733.

Debtor listed the bulk of his liabilities as unsecured guaranty claims held against him by various lenders on his land bank projects. Debtor did not initially list the December 2010 transfers of the Tax Refunds by him to Searchlight. Those transfers totaled $2,261,551. It was not until March 29, 2013, nearly 1.5 years after the Petition Date, that Debtor finally filed an amended SOFA reflecting this transfer (Debtor's Exhibit D).

3.    Section 341 1st Meetings

Debtor's chapter 11 first meeting of creditors was held on January 12, 2012. *See* Plaintiff's Exhibits 10 and 62. At that meeting he committed under oath to the repayment to the estate of the $500,000 listed in his Schedule B as owed to him by Searchlight. Exhibit 10, pages 15, 16 and 19. He also testified that the $500,000 in question was a loan to Searchlight for it to make "some property acquisitions" and that his children owned and controlled Searchlight. Exhibit 10, pages 20 and 24.

Debtor's Chapter 7 first meeting of creditors was held on July 24, 2012. Plaintiff's Exhibits 11 and 63. At that meeting, he testified he had no involvement in Searchlight, no signing authority over its accounts and no control over the disposition of Searchlight's funds. Exhibit 11, page 15. His Schedules listed a $500,000 debt owed to him by Searchlight because, even though the account was in the possession and control of his children, he looked at the Searchlight checkbook to see how much was in the account on the Petition Date. Exhibit 11, page 17. Searchlight was to acquire and sell properties and the sales proceeds were to be used to pay down his debt. Exhibit 11, page 17 and 23. Although the money was never used to acquire properties, when he needed money, he asked for those funds and Searchlight paid them to him. Exhibit 11, pages 17, 18, and 25. Until his bankruptcy, his children (who allegedly controlled Searchlight) would always honor Debtor's request to pay him money out of Searchlight. Exhibit 11, page 20. Post-chapter

11, hundreds of thousands of dollars flowed from Searchlight to Tiburon and other businesses in which he and his children were involved. He used over $100,000 to pay his attorneys' fees. Exhibit 11, pages 19–22 and 26. Debtor testified that, after his January 12, 2012 1st meeting, he asked his children to transfer Searchlight's $500,000 to him but they refused to do so. Exhibit 11, pages 26–28. Debtor also testified that, other than payment of his attorney's fees, neither Searchlight nor Tiburon paid him anything nor did they pay any of his personal expenses. Exhibit 11, page 52.

### 4.  Plan and Disclosure Statement

Debtor's April 2, 2012 liquidating Plan (Plaintiff's Exhibit 28; Debtor's Exhibit A) and Disclosure Statement (Plaintiff's Exhibit 29; Debtor's Exhibit B) proposed to fund his Plan by (a) reducing to cash his $500,000 claim against Searchlight; (b) liquidating non-exempt assets; and (c) using funds realized from prosecuting the Preference Adversary. *See* Plan page 15 of 22. Of course, Debtor lost the Preference Adversary (Plaintiff's Exhibit 35) and dissipated virtually all the funds allegedly loaned to Searchlight. Although the Disclosure Statement was set for hearing on June 28, 2012 (Admin. DE 178), several creditors filed objections (Admin. DE's 172 and 190) and neither the Disclosure Statement nor Plan were ever heard, much less approved, by the Court.

### 5.  Conversion to Chapter 7

On April 19, 2012, the Committee filed a motion to appoint a chapter 11 trustee or, alternatively, to convert the case to chapter 7. (Admin. DE 176). Although the Debtor objected (Admin. DE 189) and several parties joined in the motion (Admin. DE's 188 and 193), the Debtor eventually stipulated to a conversion order which the Court entered on June 20, 2012 (Admin. DE 208). Maureen Gaughan was appointed chapter 7 Trustee (Admin. DE 209).

### 6.  The Searchlight Lawsuit

On March 12, 2012, the Committee filed an emergency motion for an order to show cause ("OSC Motion") (Admin. DE 133) seeking an order directing the Debtor to explain why he had not pursued Searchlight's turnover of the $500,000 amount Debtor

claimed it owed him on the Petition Date. Debtor responded (Admin. DE 144). At the March 22, 2012, hearing on the OSC Motion (Admin. DE 151), the parties stipulated to the entry of an order. On April 24, 2012, the Court entered its Order Regarding Motion for Order to Show Cause (Admin. DE 185) directing Debtor to pursue the estate's claim against Searchlight. On April 2, 2012, Debtor sued Searchlight in State Court. (Plaintiff's Exhibit 27).

### 7. Trustee's Settlement with Gun Bo.

On July 15, 2013, the Trustee filed a motion to approve her settlement agreement with Gun Bo and others ("Gun Bo Settlement Agreement") (Debtor's Exhibit P; Admin. DE 307). Debtor objected (Debtor's Exhibit Q; Admin. DE 339), Gun Bo responded (Debtor's Exhibit R; Admin. DE 358), the Trustee responded (Debtor's Exhibit S; Admin. DE 359), the Debtor filed an omnibus reply (Debtor's Exhibit T; Admin. DE 360), and the Trustee filed her declaration in support of the Gun Bo Settlement Agreement (Debtor's Exhibit U; Admin. DE 371). On September 16, 2013, the Court entered its Order approving the Gun Bo Settlement Agreement (Debtor's Exhibit V; Admin. DE 376). In essence, the Gun Bo Settlement Agreement provided for (a) payment to the estate of $50,000 from the sale of a condominium in San Diego; (b) the estate's release of any interests in the 440 partially improved lots known as the Westpark Property; and (c) Gun Bo was to assign certain judgment liens and $2 million of the judgments to the estate.

### 8. Trustee's Settlement with Debtor.

On August 19, 2014, Trustee, Debtor, Tiburon, and others entered into a settlement agreement ("Debtor's Settlement Agreement") (Defendant's Exhibit J) and submitted it to the Court for approval in the Trustee's motion (Debtor's Exhibit K) dated August 22, 2014 (Admin. DE 385). Gun Bo objected (Admin. DE 390; Debtor's Exhibit L), the Trustee filed her affidavit in support (Debtor's Exhibit M; Admin. DE 397) and her reply (Debtor's Exhibit N; Plaintiff's Exhibit 38; Admin. DE 398), and the Court approved the Debtor's Settlement Agreement on October 8, 2014 (Debtor's Exhibit O; Admin. DE 401). On October 22, 2014, the Court entered an amended order approving the Debtor's

Settlement Agreement (Admin. DE 407). In essence, the Debtor's Settlement Agreement called for dismissal of adversary 13-ap-00761 and for the Debtor to pay the Trustee $1 million.

         9. <u>Judicial Notice.</u>

This Court takes judicial notice of the State Court minute entries and orders and the Bankruptcy Court filings noted above. The parties stipulated to this Court taking such judicial notice.

## II. **ANALYSIS**

### A. **<u>Jurisdiction</u>**

Plaintiff contends (and Debtor admits)[10] this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2) and that this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(J). (DE 1, ¶1 and DE 9, ¶1). This Court agrees that it has jurisdiction over this Adversary Proceeding and that it is a core proceeding under § 157(b)(2).

### B. **<u>Burden of Proof in § 727 Actions</u>**

In § 727 actions, the plaintiff bears the burden of proof by a preponderance of the evidence. *In re Khalil*, 379 B.R. 163, 172 (9th Cir. BAP 2007), *aff'd,* 578 F.3d 1167–68 (9th Cir. 2009) ("The BAP's published opinion is a correct statement of the applicable law. . . ."). This Court must "construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge." *In re Bernard,* 96 F.3d 1279, 1281 (9th Cir. 1996) (citation omitted).

### C. **<u>Elements of §§ 727(a)(2)(A) and (B) Claims</u>**

Section 727(a)(2) provides that the debtor will be denied a discharge where:

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

---

[10] *See* Plaintiff's Complaint, ¶ 1 (DE 1) and Debtor's Answer, ¶1, (DE 9).

**(A)** property of the debtor, within one year before the date of the filing of the petition; or

**(B)** property of the estate, after the date of the filing of the petition. . . .

Under § 727(a)(2)(A), Plaintiff must prove: "1) a disposition of property, such as transfer or concealment, and 2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property. Both elements must take place within the one-year pre-filing period  . . . ." *Hughes v. Lawson (In re Lawson),* 122 F.3d 1237, 1240 (9th Cir.1997).

> A debtor's intent need not be fraudulent to meet the requirements of § 727(a)(2).  Because the language of the statute is in the disjunctive it is sufficient if the debtor's intent is to hinder or delay a creditor. Furthermore, 'lack of injury to creditors is irrelevant for purposes of denying a discharge in bankruptcy.'

*In re Retz,* 606 F.3d 1189, 1200 (9th Cir. 2010) (internal citation omitted) (citing *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986)).  "There is no requirement that the debtor intend to hinder all of his creditors."  *Adeeb*, 787 F.2d at 1343.  Moreover, a debtor is mistaken if he believes he lacks actual intent because he intended to protect some of his creditors. *See, e.g., Locke v. Schafer (In re Schafer)*, 294 B.R. 126, 131 (N.D.Cal.2003) ("As the *Adeeb* decision makes clear, withholding funds from one creditor to pay another, does not absolve the debtor of the violation of § 727(a)(2)(A) that he has committed."), *and In re Hartman*, 181 B.R. 410, 412 (Bankr. W.D. Mo. 1995) (citing *Adeeb*, that court held "[i]t only takes a showing that a debtor intended to defraud one creditor in order for the Court to deny the discharge.").

"Intent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct."  *In re Retz,* 606 F.3d at 1199.  Since intent is rarely shown by direct evidence, § 727(a)(2) claims are usually proven by circumstantial evidence.  *Id.* Such circumstantial evidence may include "badges of fraud" supporting a finding of fraudulent intent.

> These [badges of fraud], not all of which need be present, include (1) a close relationship between the transferor and the transferee; (2) that the transfer was in anticipation of a pending suit; (3) that the transferor

> Debtor was insolvent or in poor financial condition at the time; (4) that all or substantially all of the Debtor's property was transferred; (5) that the transfer so completely depleted the Debtor's assets that the creditor
>
> has been hindered or delayed in recovering any part of the judgment; and (6) that the Debtor received inadequate consideration for the transfer.

*Id.* (quoting *Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518 (9th Cir. 1992).   Actions taken by a debtor over a year prior to his bankruptcy filing can constitute circumstantial evidence of the debtor's fraudulent intent within the year of his bankruptcy filing. *See In re Butler*, 377 B.R. 895, 917 (Bankr. D. Utah 2006).

Finally, lack of injury to creditors is irrelevant for purposes of denying a discharge in bankruptcy. *In re Adeeb*, 787 F.2d at 1343.

Plaintiff contends grounds exist to deny Debtor's discharge under both (A) and (B) of § 727(a)(2).

### D.    **Elements of § 727(a)(4)(A) Claims**

Section 727(a)(4)(A) provides that the debtor will be denied a discharge where: "the debtor knowingly and fraudulently, in or connection with the case—(A) made a false oath or account . . . ."

The plaintiff has the burden of proving by a preponderance of the evidence each of the elements of a § 727(a)(4)(A) claim, namely "that '(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently.'"   *In re Retz*, 606 F. 3d at 1197 (quoting *In re Roberts*, 331 B.R. 876, 882 (9th Cir. BAP 2005) (citing *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 62 (9th Cir. BAP 1999)).

As to element (1), the debtor must be the one making the false statement and that statement must be under oath.  Of course, a debtor's schedules and statement of affairs are required to be under oath pursuant to Bankruptcy Rule 1008.  Further, under Rule 2003(b)(1), the business of a § 341 first meeting of creditors "shall include the examination of the debtor under oath . . . ."

Next, element (2) requires a showing that the oath pertains to a material fact. "A fact is material 'if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.'" *In re Khalil*, 379 B.R. at 173 (quoting *In re Wills*, 243 B.R. at 62). "An omission or misstatement that 'detrimentally affects administration of the estate' is material." *In re Retz*, 606 F.3d at 1198. "The size or nature of a single [misstatement or omission] might suffice to support a finding that a debtor knowingly and fraudulently made a false oath or account." *In re Cummings*, 595 F.Appx. 707, 710 (9th Cir. 2015) (quoting *Khalil*, 379 B.R. at 173).

"The third element required by § 727(a)(4)(A) is that the debtor act knowingly in making the false oath." *In re Retz*, 606 F.3d at 1198. "A debtor 'acts knowingly if he …acts deliberately and consciously.'" *In re Khalil*, 379 B.R. at 173 (quoting *In re Roberts*, 331 B.R. at 883). In *Retz*, the court found the debtor acted knowingly where he deliberately and consciously signed the schedules and SOFA's knowing they were incomplete. *Retz*, 606 F.3d at 1198.

The fourth and final element the Court must review is whether Debtor fraudulently made his oath. To prove this element, the Plaintiff must demonstrate fraudulent intent by showing Debtor made his false representations or omissions at a time he knew them to be false and that he made them with "the intention and purpose of deceiving [his] creditors." *In re Khalil*, 379 B.R. at 173. It is generally correct that a "debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge of his debts." *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986). "However, the debtor's reliance must be in good faith." *Id.* The advice of counsel is not a defense when the erroneous information should have been evident to the debtor. *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 111 (1st Cir. 1987). "A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath." *Id.* Such a disclaimer constitutes recklessness

and "can be part of that circumstantial evidence" used to prove fraudulent intent. *Khalil*, 379 B.R. at 174.

**E.     The Court's Additional Findings of Fact and Conclusions of Law**

In addition to the stipulated facts noted in Section I( C ) above, the Court makes the following findings of fact and conclusions of law.

1.     <u>Plaintiff's § 727(a)(4)(A) Claims (False Oath)</u>

The Court finds that Debtor is a highly intelligent, competitive businessman. His pre-Petition land banking operations were far flung and apparently quite successful. It is not at all surprising that his business suffered mightily from the dramatic economic downturn that faced the real estate market beginning in 2008. Lawsuits were inevitably filed against Debtor. Gun Bo was a particularly diligent, even aggressive, creditor. Debtor pushed back hard, stonewalling Plaintiff for years in pre-Petition litigation. Debtor eventually filed this bankruptcy, primarily in an effort to force Plaintiff to disgorge funds recovered by Plaintiff. Wanting to stay in business, Debtor endeavored to keep Plaintiff at bay. In doing so, in connection with his bankruptcy case, Debtor knowingly and fraudulently made numerous material false oaths or accounts. The following are among the knowingly and fraudulently material false oaths or accounts made by the Debtor in connection with this bankruptcy:

a.     *Schedules*

Debtor's Schedule B ¶ 19 (Admin. DE 38) claims Searchlight owed him $500,000. Less than one year before the Petition Date, Debtor transferred to the Searchlight Schwab Account his Tax Refunds totaling $2,261,551. Although Debtor contends this was a loan to Searchlight, neither Debtor nor Searchlight ever prepared any loan documents (*see* Plaintiff's Exhibit 63, page 23), Searchlight did not maintain any account payment ledgers, and no tax records reflect interest earned by Debtor or paid by Searchlight (*Id.* at 24). No evidence before this Court convinced the Court this transfer was anything other than a means of keeping the Tax Refunds away from Debtor's creditors.

This Court finds the "liquidated debt owed to Debtor" was not a debt. The money in Searchlight's accounts was Debtor's money and, therefore, property of his bankruptcy estate.

Even if this Court were to find the Tax Refunds the Debtor transferred to Searchlight then became Searchlight's money, those funds became a loan (not a gift) which needed to be repaid to Debtor. Searchlight's subsequent transfers of these funds to Tiburon, Emilie, and any other person or entity other than Debtor would not be a repayment of the debt owed to Debtor unless it was transferred for the Debtor's benefit. Debtor testified that these funds were transferred to Tiburon and others to enable them to operate entities for the benefit of some (but not all) of his creditors. Debtor testified he was not personally benefitted from these funds. If he did not benefit from these transfers to Tiburon or others then these transfers were not, as Debtor contends, in repayment of the debt Searchlight owed to Debtor. If Searchlight held only $500,000 of Debtor's Tax Refunds at the Petition Date, it owed Debtor $500,000 plus the difference between the Tax Refunds amount ($2,261,551) and the balance held at the Petition Date, *i.e.* an amount totaling approximately $1,761,551. In other words, even if the Tax Refunds transferred to Searchlight was a loan by the Debtor (and not estate property held by Searchlight), the loan balance was not $500,000 at the Petition Date, it was $500,000 plus $1,761,551. What's more, this Court finds the Debtor never intended Searchlight to return or repay to Debtor any of the Tax Refunds. Debtor's transfer of the Tax Refunds was made with the intent to hinder, delay and defraud Gun Bo and other creditors of the Debtor. (*See* Part II.E.2 below).

Debtor's Schedule B ¶ 19 was materially false. Debtor knowingly and fraudulently made these false statements under oath. Moreover, Debtor's amended Schedules and SOFA's (Admin. DE 61, 63 and 106) did not correct his materially false sworn statements.

      b.    *SOFA's*

SOFA ¶ 10 required Debtor to list all other property transferred (other than in the ordinary course of business) within two years of the Petition Date. Debtor's

initial SOFA's made no mention of the Tax Refunds he transferred to Searchlight within a year of his bankruptcy. Debtor did not revise this false sworn statement until 1.5 years later, and only long after the Tax Refunds had become a central issue in Debtor's bankruptcy case. *See* Part I.E.2 above. To the extent any portion of the Tax Refunds would have been taxable income to him in 2011, he also failed to list that income in SOFA (1) or (2).

SOFA ¶ 14 required Debtor to "[l]ist all property owned by another person that the debtor holds or controls." This Court finds that, at all relevant times, Debtor held or controlled Searchlight, Tiburon, and E&N and all real and personal property in each of these entities' names. Testimony from Emilie and Nathan confirmed their father's control. (*See* JPS, Exhibits C and D). The fact that Debtor appeared for his deposition on December 18, 2013, as the Rule 30(b)(6) witness for Tiburon and Searchlight further confirms his control over these entities.

Paragraphs 1, 2, 10 and 14 of Debtor's SOFA's were materially false and Debtor knowingly and fraudulently made these false statements under oath. Debtor's amended Schedules and SOFA's (Admin. DE 61, 63 and 106) did not correct these false oaths.

c. *Chapter 11 1st Meeting Testimony*

At his January 12, 2012 chapter 11 1st meeting of creditors, Debtor offered the following sworn testimony in answer to questions posed by creditor attorney Mike Scheurich:

> Q: What's the nature of the debt owed by Searchlight, LLC? It's listed as $500,000.
> A: What's the nature of the debt?
> Q: Yeah.
> A: It's basically an asset. It's a LLC that my kids have that isn't money owed back to me.
> (At this point Debtor and his attorney have an off the record conference in which it is clear to this Court that the Debtor is reminded that this testimony does not square with his Schedules)
> A: Okay. It's a debt, all right.
> Q: So it's a debt—
> A: Yes.

Q: To you?
A: Yes.
Q (from an unidentified 3rd person): And it's going to get paid in the next week?
A: Yeah.
…
Q: I have one quick follow-up question on Searchlight. You indicated that the debt is going to be repaid in the next seven to ten days: is that right?
A: Yeah.

(*See* Plaintiff's Exhibit 62, pages 15–16 and 19).

The Court finds that Debtor's sworn testimony was materially false, and that he knowingly and fraudulently made these statements, in that (a) he claimed the $500,000 was an asset of Searchlight and not money owed to him (even though his lawyer then helped him testify more consistent with his Schedules) and that (b) he would repay the $500,000 within the 7-10 days following that 1st meeting. The Court finds this testimony materially false because, as noted in Part II.E.1.a above, the $500,000 was Debtor's money (not Searchlight's) and, therefore, property of the bankruptcy estate. Irrespective of who owned the $500,000, the Court further finds the Debtor had no intention of ever paying these sums to the estate, much less within 7-10 days of his 1st meeting. Debtor's false testimony is material. Debtor's testimony bought Debtor several months before his failure to turnover these funds was brought to the Court's attention and before the ultimate day of reckoning when Debtor finally turned over a mere $26,500 to the Trustee (*see* Plaintiff's Exhibit 5, page 136). Debtor's false testimony enabled him to direct nearly $500,000 away from his pre-Petition creditors and into his hands, the hands of his family, and the coffers of entities he controlled.

Debtor's chapter 11 1st-meeting testimony noted above was materially false and Debtor knowingly and fraudulently made these false statements under oath with the intention that he deceive his creditors and the Court.

1

d.    *Chapter 7 1st Meeting Testimony*

2

At his July 24, 2012 chapter 7 1st meeting of creditors, Debtor testified

3 that he had no interest in Tiburon (Plaintiff's Exhibit 63, page 20).  The Court finds this

4 testimony false and further finds Debtor not only formed Tiburon but, at all relevant times,

5 managed and controlled all of Tiburon's assets, transactions and activities.

6

Debtor further testified that, after his chapter 11 1st meeting of

7 creditors, he asked his kids to return to him the $500,000 in Searchlight's account and that

8 they said no.  (*Id.* at 27).  The Court does not find Debtor's testimony credible because he

9 was in complete control of Searchlight's funds and because, at all relevant times, his

10 children did whatever he asked them to do in connection with Searchlight, Tiburon, and

11 E&N.  The Court finds Debtor never asked his children to return the $500,000 to him and,

12 of course, his children could not have refused a request that was not made of them.

13 Significantly, despite testimony from Debtor at his chapter 7 1st meeting of creditors to the

14 effect that he did not manage or control or have any involvement in Searchlight (see Exhibit

15 63, page 15), at trial Debtor admitted that testimony was false (TT, January 27 at 1:48

16 p.m.).

17

The above-referenced testimony given by Debtor at his chapter 7 1st

18 meeting was materially false and Debtor knowingly and fraudulently made these false

19 statements under oath with the intention that he deceive his creditors and the Court.

20

e.    *Disclosure Statement*

21

Debtor signed his April 2, 2012 Disclosure Statement and filed it with

22 this Court.  (*See* page 32 of Admin. DE 155). That document proposed, among other things,

23 Debtor pay $500,000 to his creditors from the money Searchlight allegedly owed him (*id.* at

24 page 27).  It also contained at exhibit "C" a liquidation analysis reflecting a $500,000

25 market value of his Searchlight receivable. Debtor's Disclosure Statement is materially

26 false in that this Court finds Debtor did not intend to pay any portion of the $500,000 to the

27 estate's creditors, nor did he disclose that Searchlight held no more than $100,000 at the

28 time he filed his Disclosure Statement.  *See* Plaintiff's Exhibit 63, page 21.

1  The above-referenced pleading, which Debtor signed and filed, was
2  materially false. Debtor knowingly and fraudulently made these false statements with the
3  intent to deceive the Court and creditors of the estate. While Debtor did not make these
4  statements under oath, these statements highlight for this Court the ongoing deception
5  which characterized Debtor's handling of his fiduciary responsibilities as a chapter 11
6  debtor-in-possession.

7  f.  *Objection to Committee's Motion for OSC*

8  In response to the Committee's emergency motion for order to show
9  cause why Searchlight, LLC had not returned estate funds to the estate ("Motion for OSC"),
10  the Debtor made two troubling representations. First, that "Debtor does not necessarily
11  have complete control over… [Searchlight]" and, second, "there is no urgency mandating
12  the immediate deposit of the Searchlight funds into an estate account. The Debtor's Chapter
13  11 plan will account for the full amount of the Searchlight funds." *See* Admin. DE 144.
14  This Court finds Debtor <u>did</u> have complete control over Searchlight. Further, this Court
15  finds there <u>was</u> a dire urgency that the Debtor turnover the Searchlight funds because
16  Debtor was perpetrating an intentional and methodical plan to dissipate those funds both
17  pre- and post-Petition. Debtor's response to the Motion for OSC contained materially false
18  statements, Debtor knew the statements were false, and Debtor intended creditors and the
19  Court to rely on those statements. *See* Part II.E.2 below. Although Debtor did not make the
20  statements under oath, these statements again underscore for this Court the false nature and
21  deceptive intent with which the Debtor handled his fiduciary responsibilities as a chapter 11
22  debtor-in-possession.

23  g.  *Payment of $17 Million to Debtor's Creditors*

24  Debtor testified that through his efforts and the use of his assets,
25  including some of the Tax Refunds, Tiburon was able to manage various assets and pay
26  almost $17 million to Debtor's creditors outside his bankruptcy. He could not produce or
27  recall any details indicating which creditors had received some of that $17 million, but he
28  did acknowledge that Gun Bo received none of it. (TT, January 28, 2012 at 2:00 p.m.).

Debtor's counsel later conceded at closing argument that Debtor did not use any of the $17 million to satisfy any of Debtor's pre-Petition creditors on account of their claims against the bankruptcy estate. (Transcript of February 11, 2015 Oral Argument at 11:35 a.m.) In essence, this Court understands the Debtor contends that his 2009 out-of-court payment plan called for a number of his creditors to "double down" in an effort to recover some of the losses they sustained during the "Great Recession." Debtor alleges it was those creditors who received the $17 million recovery.

However, that was not Debtor's testimony at trial, nor did the Debtor provide any corroborating evidence in support of this contention. The Court finds Debtor's testimony in this regard was both materially false and misleading, and that Debtor knowingly and fraudulently gave such testimony with the intention of deceiving the Court. Debtor's scheme was calculated not to pay his creditors on account of their pre-Petition claims against him but, rather, to lead them into new investment opportunities which would generate profits on their new, post-recession investments. To the extent Debtor used the Tax Refunds or any of his other pre-Petition assets within a year of his Petition or assets of his bankruptcy estate to effectuate this plan, he did so with the intent to hinder, delay and defraud his pre-Petition creditors (including Gun Bo) in that he never intended to pay any amounts on account of their pre-recession claims. *See* Part II.E.2 below.

### Section 727(a)(4)(A) Conclusions

In summary, the Court finds that, on numerous occasions in connection with his bankruptcy case: (1) Debtor made material false oaths to this Court and his creditors; (2) that Debtor knowingly and intentionally made those false oaths; and (3) that these false oaths caused substantial actual harm to the estate and Debtor's pre-Petition creditors. Debtor's representations under oath were not merely loose, off the cuff statements. Debtor is sophisticated. Debtor is intelligent. Debtor knew the consequences of his actions. Debtor was engaged in a long term program to defeat his creditors, particularly Plaintiff. He stopped at almost nothing in his grudge match with Gun Bo.

Plaintiff has sustained its burden of proof and is entitled to a judgment of this Court denying the Debtor his discharge pursuant to 11 U.S.C. §727(a)(4)(A). Plaintiff is directed to lodge a form of judgment consistent with this Order.

2. <u>Plaintiff's §§ 727(a)(2)(A) and (B) Claims (Intent to Hinder, Delay, or Defraud)</u>

For years Debtor has been engaged in expensive battles with Plaintiff. In an effort to stay in business and with an apparent desire to punish Plaintiff's unwillingness to go along with his post-Petition workout scheme, Debtor continually found ways to dodge Plaintiff's collection remedies. Debtor's desire to defeat Plaintiff's pursuit became much more than a lawful game of cat and mouse. Debtor's sophisticated, even complicated, maneuvers to outrun Plaintiff crossed well over the line of the permissible. The Court finds that, within one year of the Petition Date and since the Petition Date, the Debtor, with the intent to hinder, delay or defraud his creditors or the Trustee, transferred, removed, or concealed, or has permitted others to transfer, remove or conceal the Debtor's pre-Petition property or property of the bankruptcy estate. In support of this conclusion, the Court finds the following:

a. *Pre-Petition Transactions and Litigation with Gun Bo*

For over 3 years prior to the Petition Date, Debtor and Gun Bo were engaged in contentious and expensive litigation in the State Court. Not only did Gun Bo obtain a Judgment of more than $7 million against Debtor and others, the State Court repeatedly sanctioned Debtor for intentionally hindering and delaying Gun Bo's collection efforts. The State Court's findings are contained in the orders and minute entries which the Court has extensively recounted in Part I.E.1 above.

This Court finds that Debtor took certain pre-Petition actions, which the State Court found and described, with the intent to avoid payment to Gun Bo and while often ignoring or avoiding the orders of the State Court. Debtor manipulated the property of the Los Cabos Trust similar to how he later manipulated Searchlight and Tiburon to keep

his funds out of his creditors' hands, particularly Gun Bo. Debtor dominated that Trust, Westpark, Coronado West, and his other entities for his own personal uses intending that Gun Bo and other creditors be denied access to funds that he could have used to repay such creditors. To the extent Debtor's actions were outside the one year period prior to the Petition Date, those actions constitute circumstantial evidence of Debtor's intent within the one year and also after the Petition Date.

This Court finds Debtor's actions recounted by the State Court were consistent with what this Court finds to be an ongoing scheme to defeat the collection efforts of his creditors both pre-Petition (including during the one year prior to the Petition) and post-Petition. This was the Debtor's modus operandi, his course of dealing, his master scheme to defeat legitimate claims of his pre-Petition creditors. This Court finds that within the year prior to the Petition Date, and in the time post-Petition, the Debtor transferred his property and his entities' property' with a subjective intent to hinder, delay, and defraud his creditors.

b. *Debtor's Insolvency*

Debtor admits he was insolvent in 2010 (see Part I.B, above), his bankruptcy schedules (Admin. DE 38) reflect his insolvency on the Petition Date, and this Court finds that, at all times relevant to the claims in this Adversary Proceeding, the Debtor was insolvent and Debtor knew he was insolvent.

c. *Searchlight and Tiburon*

The formation of Searchlight and Tiburon was Debtor's idea, and he controlled all the decisions and activities of these entities, including decisions concerning the use of funds which came to be in Searchlight's possession. *E.g.*, Exhibit 63 at p. 15.

All acts by Debtor's children purportedly on behalf of Searchlight or Tiburon were done at Debtor's request, direction, or demand. The Cork children may have been listed as officers and/or holders of the equity interests of Searchlight and Tiburon, but they served in such capacities at the direction of their father and to serve their father's will.

This Court finds Emilie did what she did for Searchlight and Tiburon and signed what she signed because she was asked to do so by her father or people making such requests on behalf of the Debtor (*e.g.*, Julie Jagielko and Monica Suero). At all times relevant to this matter, Emilie acted at the Debtor's direction, for his benefit, and as his agent. This was the essence of testimony by Emilie, and Debtor confirmed as much at his Chapter 7 § 341 first meeting of creditors. Exhibit 11, pages 53–55.

This Court finds Nathan did what he did for Searchlight and Tiburon and signed what he signed because his father asked him to do so. At all times relevant to this matter, Nathan acted at the Debtor's direction, for Debtor's benefit and as Debtor's agent.

At one point the Debtor told this Court and his creditors that his children controlled the Searchlight and Tiburon funds so he could not retrieve the $500,000 he sent to Searchlight. This Court finds that, at all relevant times, Debtor and Debtor alone controlled all funds held by Searchlight and Tiburon. No funds went in or out of Searchlight or Tiburon without Debtor's say so. While this Court was not asked to find that these entities were the alter ego of Debtor or that these entities were his instrumentalities, the road signs are present. There was little regard by Debtor for the separate legal status of these entities. Debtor dominated these entities, using money and property nominally titled to these entities in ways that best suited his own interests and desires. There is "such a unity of interest and ownership that the separate personalities of the [entities] and owners cease to exist." *Dietel v. Day*, 492 P.d 455, 457 (Ariz. App. 1972). He treated funds in both of these entities as if these funds were held in his own pockets. The Court finds Debtor made, or caused to be made, transfers to and from Searchlight and Tiburon with Debtor's subjective intent to hinder, delay, and defraud his creditors.

d.     *Tax Refunds*

The Debtor transferred the Tax Refunds to Searchlight with the intent of ultimately transferring those funds to Tiburon or other entities controlled by him. He claims these funds were expended in his efforts to prop up entities for which the investors

or creditors of those entities were willing to continue to work with the Debtor and the entities Debtor controlled. However, when asked how he or his creditors were benefitted by his transfers to Searchlight and Tiburon, Debtor could not answer the question.

When he transferred the Tax Refunds to Searchlight, Debtor knew Plaintiff would not work with him, Searchlight, or Tiburon. Debtor also knew Plaintiff would not cooperate with him when he (or others, at his direction) transferred funds out of Searchlight. Debtor transferred the Tax Refunds to Searchlight with the intent to hinder, delay, and defraud Plaintiff in its efforts to collect its State Court Judgment against Debtor. This Court finds Debtor made such transfers with a subjective intent to hinder, delay, and defraud Plaintiff and other creditors of Debtor, and to deny Plaintiff and such other creditors access to any portion of Debtor's Tax Refunds.

At all relevant times post-Petition, the Debtor intended to spend all or substantially all of the funds in Searchlight's possession to or for the benefit of his family or himself or investors (other than the Plaintiff), and that Debtor caused Searchlight, Tiburon, and his children to effectuate that intent.

Debtor's scheduling of a $500,000 loan by him to Searchlight was a farce. Debtor transferred the Tax Refunds to Searchlight with the intent that such cash remain Debtor's cash to be used as he pleased. Transferring the Tax Refunds to the Searchlight entity was the functional equivalent of transferring these funds to a bank account exclusively controlled by Debtor. Debtor alone decided how to spend those funds. His will was expressed to his children and his subordinates and they gave effect to Debtor's wishes. The Court finds Debtor intended that no portion of the Tax Refunds would ever be used to pay Plaintiff or to in any way benefit Plaintiff.

Debtor's transfer of the Tax Refunds to Searchlight was a transfer of substantially all of the valuable assets he owned on that date. No records of Searchlight reflected its receipt of the Tax Refunds as a loan to it from Mr. Cork, nor do Searchlight's records reflect a paydown of a loan from when Searchlight transferred funds to Tiburon or to any other destination. This transfer was neither a loan nor intended as a loan, but rather

as a means to keep this cash away from Plaintiff and to maintain control of the cash outside his soon-to-be-created bankruptcy estate. Debtor transferred these Tax Refunds to Searchlight, for no consideration, in the year prior to his bankruptcy filing, albeit to an entity he effectively and entirely controlled.

Debtor admits he transferred assets out of his name so those assets (including the Tax Refunds) could be controlled free from litigation. The Court finds this is an admission that Debtor made these transfers with the intent to hinder and delay his creditors.

e.    *The Searchlight Lawsuit*

Debtor suggests his post-Petition filing of the Searchlight Lawsuit stands as evidence of his good faith and that he was properly discharging his fiduciary duty as the debtor-in-possession. The Court finds Debtor's testimony to not be credible. This Court finds just the opposite to be true. Debtor sued Searchlight long after he falsely promised to retrieve, within 7-10 days of his chapter 11 first meeting, the $500,000 amount Searchlight "owed" to Debtor. In the interim, he continued to bleed funds out of Searchlight and even repeatedly did so following the filing of the Searchlight Lawsuit. Debtor filed the Searchlight Lawsuit, purportedly seeking recovery of the sum of $500,000 from Searchlight, in attempt to stall the Committee's efforts to remove Debtor as the debtor-in-possession in his Chapter 11 case. This Court finds the filing of the Searchlight Lawsuit was a smokescreen and that Debtor made and engaged in these post-Petition transfers and actions with the actual intent to hinder, delay, and defraud Gun Bo and other creditors of this estate.

After filing the Searchlight Lawsuit, the Debtor continued to direct the transfer of funds in Searchlight's possession out of Searchlight's hands for the benefit of Debtor, his family, and his business interests. For example, Debtor filed the Searchlight Lawsuit on April 2, 2012 and yet, on April 9, 2012, Debtor directed the transfer of $30,000 out of Searchlight and to Tiburon. As noted above, Debtor controlled both of those entities.

1  Debtor continued to direct money out of Searchlight even after he stipulated to the
2  appointment of the chapter 7 Trustee.

3         This Court finds any of Debtor's purported efforts to discharge his
4  fiduciary duties as debtor-in-possession were long after the fact of transfers he made or
5  directed with the intent to evade Plaintiffs' collection efforts, which evasive tactics Debtor
6  took to harm Plaintiff, to hinder plaintiff, to delay Plaintiff, and to defraud Plaintiff.

7                    f.    *Monthly Operating Reports*

8         Debtor's filed his June 2012 monthly operating report ("MOR") on
9  August 15, 2012 (Admin. DE 225).  That MOR reflects wages ($8,013) and consulting fees
10 ($12,000), both sent to him via electronic funds transfers from Coronado West on June 1
11 and June 4, 2012.  However, the MOR and attached bank statements do not reflect his
12 receipt of $5,000 (via CW El Dorado) or $7,500 on June 26, 2012 from Searchlight, yet he
13 did receive those funds via Searchlight checks #1070 and 1069 after the Court converted
14 Debtor's case to chapter 7.  *See* Plaintiff's Exhibit 5, pages 132–33.  Debtor's MOR does
15 not indicate it is a partial month report, but the Court understands Debtor need not
16 necessarily report receipt of funds post-conversion to chapter 7. Nevertheless, the Court
17 finds Debtor looted the Searchlight Account (which was estate property) after his chapter 7
18 conversion.  Debtor committed this looting with the subjective intent to hinder, delay, and
19 defraud the Trustee and Debtor's creditors.

20                    g.    *Schwickerath's Testimony*

21        This Court finds that Debtor directed the production of the Excel
22 spreadsheets Schwickerath relied on in his report and testimony (TT, January 28, 2015 at
23 9:02 a.m.), and that Schwickerath fairly relied upon these spreadsheets.

24        It was unclear from Schwickerath's testimony to this Court whether
25 payments noted by Schwickerath as going to Wells Fargo and/or American Express were on
26 account of pre-Petition claims Debtor owed to those creditors but Exhibit 26, page 26
27 (Attachment G) reflected only $182,346.21 paid to creditors holding pre-Petition claims

28

1   against Debtor.[11]   These payments, however, could well have been on account of post-

2   Petition liability owed to those creditors by Debtor, Searchlight, Tiburon or some other

3   Cork entity.  In any event, this Court finds that Debtor made no serious or meaningful

4   efforts to repay the creditors listed in his Schedules and that any payments to them were

5   nominal in view of the money and assets which Debtor controlled.

6         While the Court found Schwickerath to be a credible and capable

7   expert witness, his testimony and reports were not particularly useful to this Court in

8   determining issues germane to the § 727 claims against Debtor.

9            h.   *Preber's Testimony*

10         This Court finds Debtor's expert Preber to be very knowledgeable in

11   matters involving forensic accounting.  Preber testified that approximately 71% of the funds

12   transferred out of Searchlight were for payment of business expenses.  However, he could

13   not tell the Court that these "business expenses" benefitted the Debtor, any of his pre-

14   Petition creditors, or some other person or entity.

15         Preber failed to distinguish between expenses for Debtors' businesses

16   conducted to benefit Debtor's investors and Debtor's businesses conducted to repay

17   creditors' claims, to which creditors he owed a fiduciary duty while serving as the debtor-

18   in-possession.  This Court finds few, if any, of Searchlight's or Tiburon's expenditures

19   controlled by Debtor (and he controlled all such expenses) resulted in payments towards

20   pre-Petition claims against the estate.  In this regard, it is important to distinguish between

21   holders of investment claims as opposed to holders of unsecured claims against this estate.

22   Some parties held both types of claims, but this Court finds the Debtor viewed these claims

23   quite differently.   For example, it appears to this Court that Debtor did not list investor

24   claims in his bankruptcy schedules but, rather listed, at most, only claims creditors held

25   directly against him on loan obligations and/or guaranteed liabilities.

26

27

28

---

[11] As noted in Part II.1.g, above, in closing arguments, Debtor's counsel concedes any payments to Debtor's creditors were not on account of their claims against the bankruptcy estate.

1	This Court finds Preber's reports and testimony to be of very little use

2	to this Court in resolving the § 727 issues presented to the Court.

3	        i.    *Debtor's Settlement with Trustee*

4	Debtor suggests in his defense that his settlement with the Trustee

5	makes amends for his squandering the $500,000 in the Searchlight Account on the Petition

6	Date. This Court finds that Debtor's Settlement Agreement does not absolve the debtor of

7	liability under § 727(a)(2). At all relevant times, Debtor's transfers of property from

8	Searchlight and Tiburon were made with the intent to hinder, delay, and defraud Debtor's

9	creditors. Debtor's subsequent payments to the Trustee via the Debtor's Settlement

10	Agreement did not alter this intent.

11	Debtor next suggests that Trustee's decision to not prosecute § 727

12	actions against the Debtor reflects Trustee's recognition that the estate did not have a viable

13	§ 727 clams against Debtor. However, this Court finds that Trustee's decision to not press

14	§ 727 claims against the Debtor is not an acknowledgment that valid § 727 claims did not

15	exist. Rather, Trustee was fully aware that Plaintiff was doggedly pursuing § 727 claims

16	for the benefit of all creditors so the estate's assets need not be spent duplicating Gun Bo's

17	efforts.

18	        j.    *Debtor's Settlement Discussions With Plaintiff*

19	Debtor claims to have made numerous settlement overtures to Plaintiff

20	and that these offers were met with either dead silence or a perfunctory dialog with

21	Plaintiff. Debtor suggests his settlement efforts reflect his good faith and lack of ill intent.

22	Gun Bo, for its part, points to several efforts it made to settle with Debtor. Ordinarily under

23	Rule 408 of the Federal Rules of Evidence, settlement discussions would not be reflected in

24	trial evidence before the Court. Here, however, Debtor opened the door to the parties'

25	settlement discussions. Significantly, Debtor's settlement approach included false

26	information conveyed to Plaintiff's counsel regarding property available to the Debtor with

27	which a settlement could be accomplished (see Exhibit 77 and TT January 27, 2015 at

28	approximately 11:30 a.m.). Debtor claimed to not have $500,000 at his disposal but

1  evidence presented to this Court demonstrated he had much more available to settle with
2  Gun Bo.  The Court finds the Debtor's settlement efforts were disingenuous and did not
3  reflect his good intentions.  Moreover, since Plaintiff holds a Judgment for more than $7
4  Million against Debtor, Gun Bo was under no obligation to settle with Debtor for anything
5  less than it was owed.

k.  *Payment of $17 Million to Investors*

7  At trial, Debtor and Debtor's counsel several times indicated the
8  Debtor's efforts generated a recovery of $17 million for his creditors.  This Court not only
9  finds the Debtor failed to provide evidentiary support for this assertion, the Court further
10  finds the Debtor's efforts were, at best, aimed towards aiding his investors (not the creditors
11  reported in his Schedules) and Debtor pursued these efforts principally for Debtor's benefit.
12  These efforts were in Debtor's benefit in that he made such efforts with an eye to having
13  friendly funding sources available once he was free of Plaintiff's claims and had discharged
14  the unsecured claims listed in his Schedules.  Of course, Debtor would have provided a far
15  greater return to such creditors (and without incurring hundreds of thousands of dollars of
16  administrative expenses and pre-Petition attorney's fees) had Debtor simply paid all the Tax
17  Refunds to his creditors.  Instead of delivering the entire balance of the Tax Refunds to his
18  creditors or, even the $500,000 remaining in the Searchlight Account on the Petition Date,
19  Debtor dissipated these funds and turned over only $26,500 to the Trustee once control of
20  this bankruptcy case was taken away from him.

21  Although the Debtor claims his asset transfers and pre- and post-
22  Petition conduct were part of his plan to maximize recoveries for creditors generally, this
23  Court finds Debtor's actions were intended to preserve his relationships with most of his
24  investors so as to provide himself with the best opportunity to emerge from his financial
25  difficulties.  It was these investors he hoped and believed would be willing to fund his
26  future business ventures.  The Debtor knew Plaintiff could not be counted on for any future
27  assistance so he actively and intentionally took many steps to hinder and delay Plaintiff's
28  collection efforts.

1   The Court finds that, even if Debtor orchestrated transfers to benefit

2   the business operations of entities where Debtor's investors had placed investments, those

3   transfers did not benefit the creditor claims listed in Debtor's bankruptcy schedules.

4   l.   *Badges of Fraud*

5   As additional support for the Court's finding of Debtor's subjectively

6   fraudulent intent in connection with his pre- and post-Petition transfers, this Court looks to

7   the badges of fraud identified by the Ninth Circuit in *Retz*[12]:

8   First, the Tax Refunds, the Los Cabos assets, the Westpark assets, and

9   funds held by Searchlight and Tiburon were transferred to Debtor, his children and entities

10  dominated and controlled by Debtor.  There were very close relationships between these

11  transferors and transferees.  Debtor controlled all of them.  While some of these transfers

12  admittedly occurred outside the 727(a)(2)(A) one year look back period, this Court finds a

13  consistent pattern of deception, inside dealing and Debtor's intent to thwart rightful claims

14  of his creditors.

15  Second, Debtor made the transfers in question before, during, and after

16  his State Court Lawsuit with Gun Bo and at a time when many others were suing or had

17  sued debtor, Mrs. Cork, and Debtor's entities.  Although Debtor claims to have (together

18  with his legal and accounting advisors) established his scheme before the State Court

19  Lawsuit, the Court finds Debtor was well aware of the inevitability that creditors would be

20  pursuing collection remedies against his assets.  The "anticipation of a pending suit" badge

21  of fraud is clearly present.  Moreover, even if Debtor was acting upon the advice of his

22  lawyers or other advisors (and Debtor did not persuade the Court he did), Debtor is saavy

23  enough and intelligent enough to know the consequences of his actions.

24  Third, as noted in Part II.E.2.b above, the Debtor was, at all relevant

25  times, insolvent.  Massively so.

26  Fourth, when Debtor transferred the Tax Refunds to the Searchlight

27  Account, he was transferring substantially all of his non-exempt assets.   When he

28

---

[12] See pages 26-27, above.

1  transferred those funds out of Searchlight, he effectively moved substantially all his non-

2  exempt net worth beyond the grasp of his creditors, especially Gun Bo.

3            Fifth, the transfers described above so depleted Debtor's assets that

4  Gun Bo and Debtor's bankruptcy estate were hindered and delayed in recovering their

5  claims against Debtor.

6            Sixth, the only consideration Debtor received for the transfers and re-

7  transfers of his assets was the cooperation of his pre-recession investors in post-2008

8  transactions.  Granted this was important to Debtor and was his main objective in making

9  these transfers.  However, as noted above, the fact that Debtor feathered his post-recession

10 nest by working cooperatively with these investors did not result in any meaningful

11 payments of Debtor's pre-petition claims to his creditors, including these investors.

12            In summary, every badge of fraud identified in *Retz* is present in this

13 matter.  The Court finds that, in the one year prior to the Petition Date and in the time after

14 the filing of the Petition, the Debtor, with the subjective intent to hinder, delay, or defraud

15 his creditors, transferred, removed, or concealed, or has permitted others to transfer,

16 remove, or conceal, the Debtor's property.

17

18            Sections 727(a)(2)(A) and (B) Conclusions

19            This Court finds that, in the one year prior to the Petition Date, the Debtor,

20 with the subjective intent to hinder, delay, or defraud his creditors, transferred, removed, or

21 concealed, or has permitted others to transfer, remove, or conceal, the Debtor's property.

22 Plaintiff has sustained its burden of proof and is entitled to a judgment of this Court denying

23 the Debtor his discharge pursuant to 11 U.S.C. § 727(a)(2)(A).  Plaintiff is directed to lodge

24 a form of judgment consistent with this Order.

25            The Court further finds that, after the Petition Date, the Debtor, with the subjective

26 intent to hinder, delay, or defraud the his creditors or the Trustee, transferred, removed, or

27 concealed, or has permitted others to transfer, remove or conceal, property of the

28 bankruptcy estate.  Plaintiff has sustained its burden of proof and is entitled to a judgment

of this Court denying the Debtor his discharge pursuant to 11 U.S.C. § 727(a)(2)(B). Plaintiff is directed to lodge a form of judgment consistent with this Order.

**DATED AND SIGNED ABOVE.**